**EXXON SHIPPING COMPANY,
A Delaware Corporation,
Plaintiff,**

**v.**

**EXXON SEAMEN'S UNION, Defendant.**

**Civ. A. No. 92–372 (AJL).**

United States District Court,
D. New Jersey.

Aug. 11, 1992.

Albert R. Galik, Houston, Tex., and John F. Tully, Joseph T. Walsh, III, Linden, N.J., for plaintiff.

Howard A. Goldberger, West Orange, N.J., for defendant.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of plaintiff Exxon Shipping Company ("Exxon") for summary judgment to vacate an arbitration award (the "Arbitration Award") in favor of the Exxon Seamen's Union (the "Union") which required Exxon to reinstate Randall Fris ("Fris") as an able bodied seaman rather than discharge him from employment.[1] Jurisdiction is alleged pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and appears to be appropriate.

For the reasons set forth below, the Arbitration Award is vacated.

FACTS

Exxon is a Delaware corporation with its principal place of business in Texas. Exxon 12G Statement, ¶ A(1). Exxon operates American flag ships and other vessels on the high seas and the inland water ways of the United States. *Id.* The Union is an unincorporated labor organization representing "all unlicensed personnel employed in the Deck, Engine, and Stewards Departments of Exxon Shipping's vessels." *Id.*, ¶ A(2). Fris has been an employee of Exxon since 1981.

On 31 July 1985, Exxon and the Union entered into a collective bargaining agreement (the "Agreement") concerning the "wages, hours and other terms and conditions of employment of those employees [for whom] the Union had been certified as the exclusive bargaining representative." *Id.*, ¶ A(3). Article V of the Agreement contains grievance and arbitration procedures. Exhibit 1B. The provisions regarding the arbitration of disputes provide in pertinent part:

C. The decision of the majority of the said Board of Arbitration shall be final and binding upon the employee, [Exxon] and the [Union], and shall conclusively determine the same not to exceed the life of this Agreement.

. . . .

E. If either party refuses to arbitrate under the conditions set forth above, or after arbitration, refuses to abide by the decision heretofore prescribed, the other party may pursue its lawful remedies.

*Id.*

On 1 April 1988, the Agreement was modified by the implementation of several proposals. Exxon 12G Statement, ¶ A(4). The terms and conditions of the modifications were set forth in a letter, dated 29 March 1988 (the "29 March 1988 Letter"), from Exxon to all ocean going employees of Exxon, including Fris. *Id.;* Exhibit 1A.

1. In support of its motion Exxon submitted the following: Brief in Support of Plaintiff Exxon Shipping Company's Motion for Summary Judgment (the "Moving Brief"); Reply Brief to Defendant's Opposition to Plaintiff Exxon Shipping Company's Motion for Summary Judgment (the "Reply Brief"); Plaintiff Exxon Shipping Company's Statement of Material Facts Not in Dispute (the "Exxon 12G Statement"); and Exhibits, including as exhibit 1.F, the Arbitration Award and as exhibit 7, the affidavit of Timothy R. Titus, Jr. (the "Titus Aff.").

In opposition to the motion, the Union submitted: Brief in Opposition to Plaintiff's Motion for Summary Judgement (the "Opp. Brief"); Affidavit in Support of Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment (the "Hillman Aff."); Defendant Exxon Seamen's Union Rule 12(G) Statement of Material Facts in Dispute and Not in Dispute (the "Union 12G Statement");

Oral argument was held on 13 July 1992; references to the oral argument will be made as "13 July 1992 Oral Arg. Tr. at ____."

The grievance procedures set forth in the Agreement remained in full force and effect. Exxon 12G Statement, ¶ A(4). Among the proposals implemented was a policy statement on employee alcohol and drug use (the "Alcohol Policy"). Exhibit 1A. The Alcohol Policy provides: "Being unfit for work because of use of . . . alcohol is strictly prohibited and is grounds for termination of employment." Exhibit 1A. It further provides that Exxon has the right to test for alcohol content in an employee's blood stream where cause exists to suspect alcohol misuse. *Id.*

By letter, dated 27 September 1988 (the "27 September 1988 Letter"), Exxon explained the Alcohol Policy and expressed its intent to implement more stringent enforcement procedures. Exhibit 1D. The 27 September 1988 Letter was sent to all ocean going employees, including Fris. *Id.;* Exxon 12G Statement, ¶ A(6). The 27 September 1988 Letter informed the employees that termination would be the standard penalty for violations of the Policy Statement. Exhibit 1D. According to Exxon, the letter served as

> another official notice that *violation of the Company Alcohol and Drug Use Policy,* or regulations governing alcohol or drug use in the work place *will result in immediate termination from the vessel.* While we must continue to thoroughly investigate the facts of each individual case and make a final determination on a case-by-case basis, *termination of employment is the penalty for violation of these standards.*

*Id.* (emphasis added). The Union contested the impact of the 27 September 1988 Letter because it was a unilateral statement which was not subject to collective bargaining with the Union.

On 5 September 1989, Exxon and the Union entered an agreement modifying the terms and conditions of employment, entitled the Memorandum of Understanding (the "Memorandum"). The Memorandum was subject to the grievance procedure set forth in the Agreement. Exhibit 1E. Specifically, the Memorandum addressed Exxon's policy with respect to alcohol use. It provided:

> A breathalyzer test may be given "for cause" by a supervisor trained to conduct such tests to anyone suspected of intoxication. A *.04 or above Blood Alcohol Content* (BAC) *is considered intoxication* and may result in discharge from the vessel and *subject the employee to further discipline up to and including termination.*

Exhibit 1E, ¶ 1(c) (the "Revised Alcohol Policy") (emphasis added). The blood alcohol content level of .04, establishing intoxication, is in accord with the level in the regulations promulgated by the United States Coast Guard (the "Coast Guard").[2]

On 13 September 1989 Fris returned to the Exxon Long Beach (the "Long Beach"), a 987–foot oil tanker, where he was employed as an able bodied seaman.[3] Exxon 12G Statement, ¶¶ A(11)–(12). Fris was observed by several of the officers of the Long Beach to be in an impaired condition. *Id.*, ¶ A(12). Therefore, Fris' blood alcohol content level was tested with a device known as an Alco Sensor III breathalyzer.[4] *Id.* The breathalyzer test revealed Fris had a blood alcohol content level of .150, more than three times Exxon's and the Coast Guard's limit. *Id.* A second breathalyzer test indicated Fris' blood alcohol content level was .163, more than four times Exxon's and the Coast Guard's limit. *Id.* On 14 September 1989 Exxon discharged Fris for violation of the Revised Alcohol Policy, various posted offenses and Coast Guard regulations. *Id.*, ¶ A(13).

---

**2.** Section 95.020 of the Coast Guard regulations provides, in relevant part:

An individual is intoxicated when:

. . . . .

(b) The individual is operating a vessel other than a recreational vessel and has an alcohol concentration of .04 percent by weight or more in their blood. . . .

33 C.F.R. § 95.020.

**3.** The duties of an able bodied seaman include steering a vessel. Exxon 12G Statement, ¶ A(11); Titus Aff., ¶ 3.

**4.** This breathalyzer device is approved by the Coast Guard. Exxon 12G Statement, ¶¶ A(10), A(12); Exhibit 6.

Subsequently, the Union filed a grievance protesting Exxon's discharge of Fris. *Id.*, ¶ A(14). No resolution was reached during the grievance procedure; accordingly, the dispute was submitted to arbitration. *Id.* On 11 July 1991, the parties appeared at a hearing before the arbitration panel (the "Arbitration Panel"). *Id.*, ¶ A(15). The issue presented to the Arbitration Panel was whether Fris was discharged for just cause and if not, what the proper remedy should be. Arbitration Award at 1.

The Arbitration Award, issued 16 October 1991, stated there is no dispute that Fris was intoxicated when he went aboard the Long Beach to assume duty on 13 September 1989. *Id.* at 7. The Arbitration Panel found, however, the discharge of "Fris was not for just cause." *Id.* The Arbitration Panel reasoned that under the terms of the Memorandum and Revised Alcohol Policy, there is no mandatory requirement of discharge for an employee who is found to be intoxicated while on duty. *Id.* at 7–8. It further stated Exxon "is required to determine what discipline, 'up to and including termination,' is justified in each individual case." *Id.* at 8.

In finding that suspension, rather than discharge, was the appropriate remedy, the Arbitration Panel relied on the fact that Fris had been employed with Exxon for eight years during which time he had an unblemished record with high evaluations. *Id.* at 8–9. It stated: "Such an employee should have been given an opportunity to demonstrate that the events on September 13, 1989, were an aberration, and that they would not occur again." *Id.* at 9. The Arbitration Panel concluded: "[T]here is no public policy that requires [Exxon] to terminate all employees who are intoxicated aboard its vessels, and [its] agreement to apply progressive discipline, when applicable, does not violate any public policy." *Id.* at 9. It, however, cautioned Fris that "intoxication aboard vessels is a very serious offense, which may subject employees to termination on the first occasion, and which will surely be cause for termination thereafter." *Id.* at 9–10.

The Arbitration Panel directed Exxon to reinstate Fris with a ninety-day suspension plus backpay. *Id.* at 10. On 29 January 1992 Exxon filed the complaint seeking to vacate the Arbitration Award.

## DISCUSSION

Exxon moves for summary judgment to vacate the Arbitration Award on the ground that it violates public policy and it does not draw its essence from the collective bargaining agreement. Moving Brief at 1, 9–15; Reply Brief at 3–6. The Union argues the Arbitration Award does not violate public policy because Fris did not have a history of abuses of alcohol and a ninety-day suspension is sufficient penalty for conduct which is an aberration. Opposition Brief at 12–22. The Union further argues the Agreement does not require that all employees be terminated if found to have violated the Revised Alcohol Policy. *Id.* at 23–29.

### A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Desvi, Inv. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); *Gray v. York Nwspr.*, 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the rec-

ord."); *Nathanson v. Medical College of Penn.,* 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1265 (3d Cir. 1992); *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.* ' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. Reviewing Arbitration Awards

Courts play a limited role in reviewing arbitration awards. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987); *Stroehmann Bakeries, Inc. v. Local 776, Int'l Brotherhood of Teamsters,* 969 F.2d 1436, 1441 (3d Cir.1992); *Exxon Shipping Co. v. Exxon Seamen's Union,* 788 F.Supp. 829, 836 (D.N.J.1992), *appeal filed* (16 Mar. 1992). "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his [or her] own brand of industrial justice,' the award is legitimate." *Misco,* 484 U.S. at 36, 108 S.Ct. at 370 (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)); *see also Stroehmann Bakeries,* 969 F.2d at 1441; *Eichleay Corp. v. International Ass'n of Bridge,* 944 F.2d 1047, 1050 (3d Cir.1991), *cert. dismissed,* — U.S. —, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992); *Exxon Shipping,* 788 F.Supp. at 834. Neither a court's disagreement with the arbitrator's construction of a contract nor its belief that its interpretation of a contract is better justifies a court overruling the arbitrator. *Eichleay Corp.,* 944 F.2d at 1056; *News Am. Publications, Inc. Daily Racing Form Div. v. Newark Typographical Union, Local 103,* 918 F.2d 21, 24 (3d Cir.1990) [hereinafter *"News Am. Publications I"*] (citations omitted).

Deference to arbitration awards serves to "protect the benefits of labor arbitration, namely, speed, flexibility, informality and finality." *Penntech Papers, Inc. v. United Paperworkers Int'l Union,* 896 F.2d 51, 53 (3d Cir.1990). The high level of deference is also supported by the preference expressed in federal statutes governing labor-management relations for the private resolution of labor disputes. *Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers,* 896 F.2d 745, 747 (3d Cir.1990); *see also Stroehmann Bakeries,* 969 F.2d at 1441.

"As long as the arbitrator has *arguably* construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that [the] arbitrator has committed a serious error." *News Am. Publications I,* 918 F.2d at 24 (emphasis in original). A court may decline to enforce an arbitration award only if the record justifying the arbitrator's decision is void of support. *Id.*

The instances in which a court can vacate an arbitration award are narrow. *Tanoma Mining,* 896 F.2d at 748. The vacating of an arbitration award is justified where an arbitrator has ignored the plain language of the contract or if the arbitrator's decision is unsupported by principles of contract construction. *News Am. Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103,* 921 F.2d 40, 41–42 (3d Cir.1990) [hereinafter *"News Am. Publications II"*]. Vacating an award is also proper if the award does not draw its essence from the collective bargaining agreement, *Tanoma Mining Co.,* 896 F.2d at 747–48, or if the arbitrator substitutes his or her own notions of "industrial justice" for the terms of the collective bargaining agreement. *Pennsylvania Power Co. v. Local Union No. 272 of Int'l Bhd. of Elec. Workers,* 886 F.2d 46, 49 (3d Cir.1989).

Additionally, courts are entrusted with the responsibility to vacate arbitration awards which may conflict with public policy. *Misco,* 484 U.S. at 42, 108 S.Ct. at 373; *see also Stroehmann Bakeries,* 969 F.2d at 1441. "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in common law, that a court may refuse to enforce contracts that violate law or public policy." *Misco,* 484 U.S. at 42, 108 S.Ct. at 373 (citing *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–53, 92 L.Ed. 1187 (1948)).

The public policy violated must be an explicit public policy that is "well defined and dominant" and is to be determined "by reference to the laws and legal precedents

and not from general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183; *see also Stroehmann Bakeries*, 969 F.2d at 1441; *Exxon Shipping*, 788 F.Supp. at 837. Although courts are cautioned to limit the use of general notions of public policy, "the question of public policy is ultimately one for resolution by the courts." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183.

In *Misco*, the Supreme Court further refined the scope of the public policy limitation: "At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced." *Misco*, 484 U.S. at 43, 108 S.Ct. at 373. The proper inquiry is not on whether the conduct of the employee, which was the subject of the arbitration award, violated public policy. The focus, rather, is on whether the "arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted" would violate the public policy. *Id.* (emphasis in original).

In *Misco*, an employee who worked for a paper converting plant was discharged after marijuana was found in his car on company premises. *Id.* at 34, 108 S.Ct. at 369. After the arbitrator ordered reinstatement, the company filed suit in district court to vacate the arbitration award because it was contrary to public policy. The district court vacated the award and the Court of Appeals affirmed. *Id.* at 35, 108 S.Ct. at 369.

The Supreme Court reversed the Court of Appeals; the Court of Appeals made no attempt to review existing laws and legal precedents to satisfy the *W.R. Grace* requirement of articulating a well defined and dominant public policy. *Id.* 484 U.S. at 44, 108 S.Ct. at 374. Even if it had, the Supreme Court observed the Court of Appeals failed to show a clear violation of public policy, which the Court of Appeals characterized as the public policy " 'against the operation of dangerous machinery by persons under the influence of drugs or alcohol.' " *Id.* at 44, 108 S.Ct. at 374 (citation omitted).

According to the Supreme Court, the fact that marijuana was found in the employee's car did not, in itself, violate public policy: "[T]he assumed connection between the marijuana gleanings found in [the employee's] car and [the employee's] actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals...." *Id.* Because the fact finding function belonged to the arbitrator, "it was inappropriate for the Court of Appeals itself to draw the necessary inference." Moreover, the Supreme Court observed:

> To conclude from the fact that marijuana had been found in [the employee's] car that [the employee] had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about [the employee's] use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award.

*Id.* at 44–45, 108 S.Ct. at 374.

Shortly after *Misco* was decided, the Circuit considered the appeal of an order vacating an arbitration award as a violation of public policy.[5] *See United States Postal Serv. v. National Ass'n of Letter Carriers*, 839 F.2d 146 (3d Cir.1988). In *National Ass'n of Letter Carriers*, the Postal Service discharged a postal employee for firing a gun at his Postmaster's empty parked car while the employee was off-duty. The

---

5. Prior to *Misco*, the Circuit rejected a tire manufacturer's argument that an arbitration award reinstating an employee who was discharged for drinking alcohol during working hours violated public policy. *See Super Tire Eng'g Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 122, 125 n. 6 (3d Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984). The court stated

reinstatement of a spot repairer "conflicts with no law or well-defined policy of which we are aware." *Id.* at 125 n. 6. It further distinguished the facts from a situation where an employee poses a threat to fellow workers or society. *Id.* (citing *Amalgamated Meat Cutters, Local Union 540 v. Great Western Food Co.*, 712 F.2d 122 (5th Cir.1983)).

employee voluntarily confessed to the conduct. Although agreeing that the employee should be disciplined, the arbitrator found no just cause existed for discharging the employee and ordered reinstatement. *Id.* at 147.

On a motion to vacate the award, the district court held the award was contrary to public policy. The district court asserted there was a public policy against permitting an employee to " 'direct physical violence at a superior, and an equally compelling policy against forcing that superior to again employ the man.' " *Id.* at 148 (citation omitted). Additionally, it was determined the arbitrator misconstrued the meaning of "just cause" standard in the collective bargaining agreement and that the arbitrator had ignored relevant facts in arriving at his decision. *Id.* The defendant appealed the vacatur of the arbitration award.

On appeal, the Circuit applied the then recent *Misco* standard and held the district court exceeded the scope of its reviewing authority. The arbitrator had determined the employee showed no tendencies for aggression once he returned to work. The Circuit determined the district court erred in rejecting the arbitrator's fact-finding determination of the employee's " 'amenability to discipline.' " *Id.* at 149 (citation omitted).

Because the public policy articulated in *National Ass'n of Letter Carriers* concerned the protection of the employee's coworkers and customers from the employee's violent conduct, and because the arbitrator determined that no such danger existed, the "policy ... [did] not require [the employee's] discharge for its fulfillment." *Id.* at 149–50. The district court erred in "second-guessing the arbitrator's fact-finding and construction of the 'just cause' standard for discharge under the collective bargaining agreement." *Id.* at 150. In its

decision, however, the Circuit specifically declined to delineate the precise perimeters of judicial review of arbitration awards:

Both parties have urged us to reach the question of how narrow the limits of the scope of review of a collective-bargaining arbitration decision [on public policy grounds] are.... We do not ... need to reach this question of where lies the precise boundary around our reviewing authority because, under *Misco*, the district court has clearly exceeded it. *Id.*[6]

The *National Ass'n of Letter Carriers* court, however, did not foreclose the possibility that "well defined" public policy concerns may justify vacating an arbitration award. Indeed, the Circuit has recently affirmed the vacatur of an arbitration award which reinstated an employee on the ground that the award violated public policy. *See Stroehmann,* 969 F.2d at 1446.

In *Stroehmann Bakeries,* the plaintiff discharged an employee for violation of a work rule prohibiting immoral conduct by sexually harassing a customer while making a delivery. Following the discharge, the defendant union instituted a claim under the grievance procedure set forth in a collective bargaining agreement. The claim went to arbitration during which the arbitrator concluded that the employee was not given a full opportunity to refute the claim of sexual harassment. Without making a determination as to whether the employee had sexually harassed a customer, the arbitrator ordered the employee to be reinstated with back pay. Subsequently, the district court vacated the arbitration award as being contrary to public policy. *Id.* 969 F.2d at 1437–38.

On appeal, the Circuit affirmed the district court's ruling. The *Stroehmann* court stated "there is a well-defined and dominant public policy concerning sexual harassment in the workplace...." *Id.* 969

---

**6.** Other Circuit decisions following *Misco* have not definitively delineated the boundaries around a court's reviewing authority over arbitration awards. Recent Circuit decisions have largely concerned whether the arbitrator exceeded the scope of his or her arbitration authority by issuing an award which did not draw

its "essence" from the collective bargaining agreement. *See Eichleay Corp.,* 944 F.2d at 1051; *GK Mgt., Inc. v. Local 274, Hotel Employees & Restaurant Employees Union,* 930 F.2d 301, 304–05 (3d Cir.1991); *News Am. Publications I,* 918 F.2d at 24–25; *Tanoma Mining Co.,* 896 F.2d at 748–50.

F.2d at 1441. The court further stated there is a "dominant public policy favoring employer prevention and application of sanctions against sexual harassment in the workplace...." *Id.* at 1442. It stated such policies are referred to in Title VII of the Civil Rights Act of 1964 and regulations promulgated thereunder by the Equal Employment Opportunity Commission. *Id.* at 1442.

The Circuit stated: "[A]n award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." *Id.* at 1442. The Circuit found:

> [The] arbitrator's award would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred. Certainly, it does not discourage sexual harassment. Instead, *it undermines the employer's ability to fulfill its obligation to prevent and sanction sexual harassment in the workplace.*

*Id.* at 1442 (emphasis added).

Courts of Appeals have overturned an arbitrator's award of reinstatement on public policy grounds, where the safety of the general public was implicated. *See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 666–68 (11th Cir.1988), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (award which reinstated pilot who flew while intoxicated was struck down); *Iowa Elec. Light & Power Co. v. Local Union, 204 of Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427–30 (8th Cir.1987) (vacating, for public policy reasons, arbitrator's reinstatement of nuclear power plant employee discharged for violating safety regulations); *Great Western Food,* 712 F.2d at 125 (reversing arbitrator's reinstatement of over-the-road truck driver who drank liquor while on duty); *Amalgamated Meat Cutters & Butcher Workmen v. Jones Dairy Farm,* 680 F.2d 1142, 1144–45 (7th Cir. 1982) (work rule which forbade employees from reporting unsanitary conditions directly to government officials violated pub-

lic policy); *World Airways, Inc. v. International Bhd. of Teamsters,* 578 F.2d 800, 803–04 (9th Cir.1978) (vacating arbitrator's reinstatement of airline pilot who had been demoted for judgmental deficiencies); *Georgia Power Co. v. International Bhd. of Elec. Workers, Local 84,* 707 F.Supp. 531, 533–34 (N.D.Ga.1989) (vacating reinstatement of power company employee responsible for checking various meters and gauges to ensure that high pressure equipment did not overheat because employee was chronic drug user), *aff'd,* 896 F.2d 507 (11th Cir.1990); *Exxon Shipping,* 788 F.Supp. at 842–43 (vacating reinstatement of able bodied seaman who was found to have marijuana in his system during duty). *But see Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, Int'l Ass'n of Machinists and Aerospace Workers,* 886 F.2d 1200, 1216–17 (9th Cir. 1989) (no dominant public policy that bars reinstatement of mechanic who commits reckless act in course of employment), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *Daniel Constr. Co., Div. of Daniel Int'l Corp. v. Local 257, Int'l Bhd. of Elec. Workers,* 856 F.2d 1174, 1182 (8th Cir.1988) (arbitration award of backpay for discharged employees does not implicate public safety concerns because it does not return potentially dangerous employees to workplace); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 83 (D.C.Cir.1987) (arbitration award reinstating pilot who piloted flight within twenty-four hours of consuming alcohol and who had blood alcohol level in excess of Federal Aviation Administration (the "FAA") regulations not violative of public policy because it was conditioned on FAA's recertification of pilot), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988).

Although the precise determination as to when courts should inquire about public policy violations is uncertain, it is at least clear that once the public policy issues are isolated, the public policy considerations belong to the courts, not the arbitrator. As one court observed:

> An arbitration award is not to be based on public policy considerations, since pub-

**1388**

lic policy questions are for the court, not the arbitrator. An arbitrator who based an award on public policy considerations exceeds his powers. Accordingly when an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator.

*Board of County Comm'r v. Kimball and Assoc.,* 860 F.2d 683, 686 (6th Cir.1988), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *see also W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183 ("Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, 'the question of public policy is ultimately one for resolution by the courts.'").

■ Arbitration awards which make fact-findings which affect public safety are to be accorded less deference. *See E.I. Du Pont de Nemours and Co. v. Grasselli Employees Indep. Assoc.,* 790 F.2d 611, 617 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).[7] The several courts which have vacated arbitration awards on public policy grounds have relied on public safety concerns as their justifications. *See, e.g., Delta Air Lines,* 861 F.2d at 666–68; *Iowa Elec. Light & Power Co.,* 834 F.2d at 1427–30.

■ Where public policy considerations concern public safety, as in this case, courts should decide the public policy mat-

ters instead of deferring them to arbitrators by cloaking them as arbitration issues. Where public safety is the public policy at issue, courts should err on the side of scrutinizing arbitration findings more closely and vacating arbitration awards which violate well defined and dominant public policies.

**C.  Public  Policy  Against  Alcohol  Abuse**

■ In this case, the dangers associated with the negligent operation of a 987–foot oil tanker implicate significant public safety concerns. As required by *Misco* and *W.R. Grace,* the existence of a well defined and dominant public policy against having intoxicated persons operate commercial vessels is discussed below. Also addressed is how this policy would be clearly violated by not vacating the Arbitration Award reinstating Fris.

Significant to this case are the Coast Guard regulations regarding intoxication while operating a vessel. *See* 33 C.F.R. Part 95 (1991). These regulations were promulgated to "establish intoxication standards ... and to prescribe restrictions and responsibilities for personnel on vessels...." *Id.,* § 95.001. The Coast Guard regulations state a person who is operating a non-recreational vessel is intoxicated if he or she has a blood alcohol content level of .04 percent by weight or more. *Id.,* § 95.020. The regulations authorize the imposition of penalties on an individual who operates a vessel while intoxicated.[8] *Id.,* § 95.055.

**7.** In considering this issue, the Seventh Circuit observed:

The appropriate standard of review for a factual finding such as this which pertains to a public policy exception has not yet been judicially established. On the one hand, plaintiff's attack on this factual finding can be viewed as an end-run around the normal extreme judicial deference to arbitral fact-finding. Under this view, a court would apply that same extremely deferential standard of review to this type of factual finding as with all arbitral factual findings. On the other hand, this kind of factual finding is different because it pertains to a public policy exception. An arbitral award is not to be enforced

if it violates public policy, and this duty would be impaired if a court had to defer to clearly erroneous factual findings made by the arbitrator. *Viewed in this light, a less deferential standard of review such as the "clearly erroneous" standard embodied in Fed. R.Civ.P. 52(a) might be more appropriate with respect to this type of [public policy] factual finding.*

*E.I. Du Pont de Nemours,* 790 F.2d at 617 (emphasis added).

**8.** Section 95.055 provides:

An individual who is intoxicated when operating a vessel in violation of 46 U.S.C. 2302(c) shall be:

Additionally, a myriad of regulations from various Governmental agencies concerning alcohol and drug testing programs highlights the efforts made to eradicate alcohol and drug abuse in the workplace. *See e.g.,* Drug–Free Workplace Act of 1988, 41 U.S.C. § 701 *et seq.;* Guidelines for Nuclear Power Plant Drug and Alcohol Testing Programs, 10 C.F.R. § 26 (1991); Federal Aviation Administration Drug Testing Program, 14 C.F.R. § 121, Appendix I (1991); Procedures for Transportation Workplace Drug Testing Programs, 49 C.F.R. § 40.1 (1991) (Dep't of Transp.); Department of Defense Drug Abuse Testing Program, 32 C.F.R. § 60.1 (1991); Control of Alcohol and Drug Use: Procedures and Safeguards for Urine Drug Testing, 49 C.F.R. § 219, Appendix A (1991) (Federal Railroad Administration); Control of Drug Use in Mass Transportation Operations, 49 C.F.R. § 653.1 (1990) (Urban Mass Transportation Administration).

Similarly, case law has established a dominant public policy against intoxication on the job where such intoxication impacts public safety. *See, e.g., Delta Air Lines,* 861 F.2d at 666–68; *Super Tire,* 721 F.2d at 125 n. 6; *Great Western Food,* 712 F.2d at 125.

Statutes, cases and regulations concerning alcohol or drug testing and the dangers of alcohol or drug use in the workplace comprise a well defined and dominant public policy which supports the policy against having intoxicated persons operate commercial vessels. As outlined below, this public policy would be clearly violated if the Arbitration Award granting reinstatement after a ninety-day suspension is upheld.

The Arbitration Award does not require any rehabilitation efforts. Significantly, Fris never requested rehabilitative treatment prior to or in the wake of the incident on 13 September 1989. To prevent a recurrence of another alcohol-related incident, the Arbitration Panel merely required that Fris be subject to a ninety-day suspension.

In addition, at the hearing on the motion to vacate, the Union's counsel stressed Exxon's policy to rehabilitate employees rather than discharging them to argue that public policy did not require discharging Fris.

Exxon's rehabilitation policies, however, stress preventive rehabilitation efforts rather post-violation/post-accident attempts to seek treatment. The Alcohol Policy states:

No employee with alcohol or drug dependency will be terminated or otherwise disciplined solely due to a request for help in overcoming that dependency or because of involvement in a rehabilitation effort. If, however, an employee violates provisions of the Employee Alcohol and Drug Use Policy, appropriate disciplinary action will be taken. *Such action cannot be avoided by a request at that time for treatment or rehabilitation.*

Alcohol Policy (emphasis added). The 27 September 1988 Letter reiterated this policy:

[I]f an employee's request for rehabilitation is made after the Company's discovery of a violation of the [Drug] [P]olicy, the Company will take disciplinary action which may include termination. Such disciplinary action cannot be avoided by a request for treatment or rehabilitation at that time.

Exhibit 1D.

Rehabilitation plays a key role in determining whether public policies would be violated by reinstating an employee who tested positive for alcohol content on the job. Rehabilitative efforts, however, work best when used as a preventive tool. Thus, the Alcohol Policy stressed preventive treatment and explicitly stated requests for rehabilitation may not be made post violation or post accident simply to avoid disciplinary action for a violation of the Alcohol Policy. Although reinstating rehabilitated employees may not itself offend public policy, *see Delta Air Lines,* 861 F.2d at 674, reinstating an employee who tested posi-

(a) Liable to the United States Government for a civil penalty of not more than $1,000; or,

(b) Fined not more than $5,000, imprisoned for not more than one year or both.
33 C.F.R. § 95.055.

tive for alcohol content and who did not seek rehabilitation before an accident or incident does.

The public policy underlying efforts to keep intoxicated persons from operating commercial vessels is severely undermined by the Arbitration Award. Requiring Exxon to reinstate Fris also subverts the Alcohol Policy. Reinstating Fris frustrates Exxon's efforts to eradicate intoxication in the workplace and prevents Exxon from carrying out its obligation and duty to eliminate alcohol abuse among its employees and especially among those employees responsible for the operation or navigation of its ships.

Requiring reinstatement in effect condones Fris' excessive intoxication. *See, e.g., Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA,* 915 F.2d 840, 843 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991).[9] The indifference with which the Arbitration Award treats Fris' excessive intoxication sends an undesirable signal to other employees that alcohol abuse in a safety-sensitive job and industry would not be severely punished. The lack of deterrence nurtures an environment unsafe for the workers, the public and the environment.

The Arbitration Panel found reasonable cause existed to test Fris and to discharge Fris from his duty on the Long Beach that evening was proper. Arbitration Award at 7. The results of the tests of .150 and .163 were sufficient for the Arbitration Panel to determine that Fris engaged in misconduct, violated the Revised Alcohol Policy and therefore was subject to discipline.

Cases which have upheld arbitration awards despite public policy attacks concerned findings of fact made by the arbitrator which persuaded courts that public policies would not be violated. In *National Ass'n of Letter Carriers,* the arbitrator made a specific finding of fact that a postal employee who fired gun shots at his Postmaster's empty parked car no longer showed violent tendencies. 839 F.2d at 149. Because the arbitrator found the employee no longer posed a safety threat, the Third Circuit held no public policies concerning the safety of the employee's co-workers would be violated. *Id.*

In *Oil Chemical and Atomic Workers, etc. Local No. 4-228 v. Union Oil Co.,* 818 F.2d 437 (5th Cir.1987), the arbitrator found that an employee who was discharged for using drugs no longer posed a safety threat because the employee had stopped using drugs. The court observed:

> This court has recognized the strong public policy against the operation of dangerous equipment by persons using drugs or alcohol. However, the arbitrator found the probability that [the em-

9. In *Newsday,* the Second Circuit decided to affirm the vacation of an arbitration award which reinstated without back pay an employee charged with sexual harassment. 915 F.2d at 843. Although the arbitrator found the dismissed employee had committed several acts of sexual harassment, he concluded that immediate discharge, as opposed to discipline, would be contrary to the concept characterized as progressive discipline. *Id.* As with this case, the arbitrator determined that the employee understood his conduct was unacceptable and that future violations would be grounds for immediate discharge. *Id.*

The district court vacated the arbitration award on the grounds of public policy, finding that statutes, regulations and judicial decisions clearly condemned sexual harassment in the workplace. *Id.* In affirming the decision to vacate, the Second Circuit found that the arbitration award should be vacated because it *"condoned [the employee's conduct], it tends to perpetuate a hostile, intimidating and* offensive work environment.... Above all, the award prevents [plaintiff] from carrying out its legal duty to eliminate sexual harassment in the workplace." *Id.* at 845 (emphasis added).

The same rationale applies to the effect of the Arbitration Award in this case. Reinstating Fris condones his misconduct and sends a signal of tolerance toward alcohol abuse among Exxon's employees. Additionally, the Arbitration Award prevents Exxon from carrying out its duty to eliminate intoxication from its workplace. Although sexual harassment is an odious offense, the risk of physical dangers and potential environmental catastrophes which follows a tolerance for intoxication at three times the permitted level of blood alcohol content among the crew on oil tankers would appear to provide an even more pressing need to (and public policy reasons for) vacate the arbitration award in this case.

ployee's] off-premises drug use would hinder or be involved in her performance on the job in the future was too low to merit her discharge. Off-duty/off-premises conduct involving the illegal use and sales of drugs is not *per se* justification for a worker's discharge. The collective bargaining agreement provides for binding arbitration. *It was within the discretion of the arbitrator in [the employee's] case to credit the public policy favoring drug rehabilitation and find that [the employee] no longer used drugs and would not present a safety risk in the future. Based on the facts available at the time of the arbitration decision, enforcement of the arbitrator's award would not have violated public policy.*

818 F.2d at 442 (emphasis added).

In *Northwest Airlines, Inc.*, the award was not found to violate public policy because the award required the employer to reinstate the pilot only after he was recertified by the FAA as fully fit and licensed to fly. 808 F.2d at 83. In that case, the public safety concerns were satisfied through the recertification requirement.

In this case, there are no findings that Fris would not engage in similar reckless conduct of coming on duty while being heavily intoxicated. The Arbitration Award, at best, stated that an employee with a favorable working history "should have been given an opportunity to demonstrate that the events on September 13, 1989, were an aberration, and that they would not happen again." Arbitration Award at 9. Unlike *Northwest Airlines* on which Fris relies, there were no conditions placed on Fris' reinstatement. Fris was only cautioned that if he was found using alcohol once more, he would be subject to immediate discharge. *Id.* at 9–10. On these facts, public policy is violated by reinstating Fris.

The Union stresses the fact that Fris had an unimpaired record and had never before arrived to duty in an intoxicated state. It argues Fris' conduct is an aberration in his record. The fact that Fris had never before engaged in such reckless conduct does not detract from the fact that his blood alcohol content level was three to four times the level permitted by the Revised Alcohol Policy and Coast Guard regulations while assuming duty as an able bodied seaman.

Moreover, Fris was clearly on notice that termination was an option for any employee who was in violation of the Exxon's alcohol policy. The 29 March 1988 Letter stated: "Being unfit for work because of drugs or alcohol is strictly prohibited and is grounds for termination of employment." Exhibit 1A. Moreover, Fris had notice of the Revised Alcohol Policy for months before he boarded the Long Beach for duty on 13 September 1989.

The grounding of the Exxon Valdez and the subsequent grounding of the Exxon Wilmington, *see Exxon Shipping,* 788 F.Supp. at 845, underscore the safety and environmental tragedies which can result from the grounding of a large vessel carrying vast amounts of oil or petroleum products. Exxon, confronted with extensive destruction of the environment and the bill for billions of dollars in clean-up costs from the Exxon Valdez incident and the potential for such in the Exxon Wilmington incident, sought to avoid other such incidents. The decision of the Arbitration Board to reinstate Fris inappropriately favors the reemployment of one individual not only at the expense of Exxon's coffers and its ability to protect itself from liability, but at the expense of the public's safety and environmental interests.

The mere appearance of a problem at times is as troubling as the problem itself. An employee does not have to be unable to speak or walk or think to be impaired or unfit for work. The presence of more than three times the permitted level of alcohol in the blood stream of Fris while he ready to assume his duties on the Long Beach, creates, *at the very least,* the appearance of a problem. In reality, it creates a serious problem in fact. Fris had significant operational responsibility for an ocean-going oil tanker.

The fact that the Exxon Long Beach was anchored during Fris' duty is of no moment. Fris nevertheless had obligations and responsibilities which required the ex-

ercise of judgment and discretion. The effects of alcohol are well-known: It impairs coordination, slows the reflexes and response time to external stimuli, dulls the senses, induces drowsiness and inhibits the ability to reason. With an excess of three to four times the blood alcohol content level permitted by Exxon and the Coast Guard, Fris would be hard pressed to exercise the judgment and discretion required even on a moored oil tanker. Fris' conduct was an extreme abuse of his position and a volitional disregard for his responsibilities. The decision by Exxon to terminate his employment was both correct and just.

Oil companies in general, and Exxon in particular, have been the subject of harsh criticism concerning their efforts to protect the safety of the public and to preserve the environment. In many instances, oil companies are not regarded as good corporate neighbors. For Exxon to continue in its employ as an able bodied seaman, a person such as Fris creates the appearance of a disregard for the safety of the public and the environment. If Fris is involved in an accident with similar amounts of a controlled substance in his system, Exxon would be hard put to explain or justify his employment.

In this case, it is uncontroverted that Fris had three to four times the limit of alcohol in his bloodstream. The risk in which Fris placed the public and the environment is unacceptable and inexcusable. Were Fris merely derelict in a non-sensitive office position or were Fris' blood alcohol content bordering on the permissible level, public policies may not mandate, as stringently, the vacating of the Arbitration Award. Fris, however, was not a deskbound employee; as mentioned, he had significant responsibilities for the operation of a large, ocean-going oil tanker. Public policy considerations must place public safety and welfare above considerations of individuals such as Fris in this instance. Those who chose to make their living with heavy responsibility for the operation or navigation of ships, aircraft or rail traffic (regardless of whether the conveyance may be passenger or freight) or in industries such as nuclear power plants, must anticipate much will be demanded of them with regard to on-the-job performance. *Exxon Shipping*, 788 F.Supp. at 846. There is no margin for error in these industries. A mistake is usually catastrophic in terms of loss of life, damage to the environment or destruction of property. A mistake caused by or clouded by the presence of an excessive level of alcohol in the system of a worker is simply unacceptable. *Id.*

Under the facts of this case, public policy cannot tolerate a second chance, as required by the Arbitration Award. It flies against notions of common sense to reinstate an employee, who had three to four times the permissible blood alcohol content in his bloodstream, to a position where he potentially increases the risks of another oil spill. Public policy would be violated by enforcing the Arbitration Award. Accordingly, the Arbitration Award is vacated.[10]

CONCLUSION

Exxon's motion for summary judgment is granted; the Arbitration Award is vacated.

---

10. Exxon also moves for summary judgment for vacatur of the Arbitration Award on the ground that it does not draw its essence from the Agreement. Moving Brief at 13–15; Reply Brief at 5. Because the Arbitration Award is vacated for violating public policy it is not necessary to address the issue of whether the Arbitration Award takes its essence from the Agreement.