**EXXON CORPORATION, Plaintiff,**

v.

**LOCAL UNION 877, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.**

No. CIV. A. 97–2198(AJL).

United States District Court, D. New Jersey.

Oct. 3, 1997.

Patrick J. Conlon, Joseph T. Walsh, III, Florham Park, NJ, for Plaintiff.

David Grossman, Schneider, Goldberger, Cohen, Finn, Solomon, Leder & Montalbano, P.C., Kenilworth, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action filed pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and 9 U.S.C. § 10. Plaintiff Exxon Corporation ("Exxon") brought suit against Local Union 877, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 877"), seeking to vacate an arbitration award (the "Arbitration Award"), dated 10 March 1997, on the grounds that enforcement of the Arbitration Award violated well-defined and dominant public policy, and that the Award does not draw its essence from the parties' collective bargaining agreement (the "CBA").

On 25 April 1997, Exxon filed a complaint (the "Complaint"). Exxon filed a motion for summary judgment to vacate the Arbitration Award (the "Motion to Vacate").[1] Local 777 filed a motion for summary judgment to confirm the arbitration award (the "Motion to Confirm").

Currently before the court are the Motion to Vacate and the Motion to Confirm. For the following reasons, the Motion to Vacate is granted; the Motion to Confirm is denied.

*Facts*

### A. CBA between Exxon and Local 877

Collective bargaining relations have existed between Exxon and Local 877 for approximately thirty years. Exxon Support Brief at 2. On 3 March 1993, Exxon and Local 877 entered into the CBA. *See* CBA, attached to Exxon Appendix, Exhibit 1A.

Article 21 ("Art. 21") of the CBA memorializes a grievance procedure (the "Grievance Procedure") agreed to by the parties. *See* CBA, Art. 21 at 19. Article 22 ("Art. 22") of the CBA memorializes arbitration procedures (the "Arbitration Procedures") agreed to by the parties. *See* CBA, Art. 22 at 21.

Article 29 ("Art. 29") of the CBA covers "discipline" and provides:

[Exxon] may discipline only for cause;

[Exxon] may post a list of offenses and publish working rules, and may change them only once each calendar year by giving [Local 877] 30 (thirty) days advance notice; and

Committing a posted offense, failing to obey the working rules, or unsatisfactory work performance may be cause for discipline.

CBA, Art. 29 at 27.

The last two pages of the CBA set forth posted offenses (the "Posted Offenses"). *See* CBA, Posted Offenses at 63–64.

---

1. In favor of Plaintiff's Motion to Vacate, Plaintiff submitted: Brief in Support of the Motion for Summary Judgment of Plaintiff Exxon Corporation (the "Exxon Support Brief"); Appendix Accompanying Plaintiff Exxon Corporation's Motion for Summary Judgment, with Exhibits 1 through 16 attached (the "Exxon Appendix"); Plaintiff Exxon Corporation's Local Rule 12(G) Statement of Material Facts Not in Dispute (the "Exxon 12G Statement"); and Reply Brief in Opposition to Defendant's Motion for Summary Judgment and in further support of the motion for summary judgment of plaintiff Exxon Corp. (the "Exxon Reply Brief").

In support of the Motion to Confirm, Defendant submitted: Defendant's Brief in Support of its Motion for Summary Judgment to Confirm an Arbitration Award (the "Local 877 Support Brief"); Defendant's Statement of Uncontested Facts Submitted Pursuant to General Rule 12G (the "Local 877 12G Statement"); Affidavit of Curt Greder, with Exhibits A through D attached (the "Greder Aff."); and Defendant Local 877's Reply Brief (the "Local 877 Reply Brief").

Before listing the Posted Offenses, the CBA provides: "An employee who commits one of the following offenses may be terminated or otherwise disciplined without notice." Posted Offenses, CBA at 63. Posted Offense Number 30 ("Posted Offense No. 30") is: "[t]esting positive on a drug or alcohol test or refusal to submit to a drug or alcohol test." CBA, Posted Offense No. 30 at 64.

### B. *Exxon's Alcohol and Drug Policy*

### 1. *The Alcohol and Drug Policy*

In September 1989, Exxon formally established an alcohol and drug policy (the "Alcohol and Drug Policy"). *See* Alcohol and Drug Policy, attached to Exxon Appendix, Exhibit 1B. Like the CBA, the Alcohol and Drug Policy provides that "[a] positive test result or refusal to submit to a drug or alcohol test is grounds for disciplinary action, including termination." Alcohol and Drug Policy at 1. In addition, the Alcohol and Drug Policy provides, in relevant part:

[Exxon] recognizes alcohol or drug dependency as a treatable condition. Employees who suspect they have an alcohol or drug dependency are encouraged to seek advice and to follow appropriate treatment promptly before it results in job performance problems. Employee Health Advisory Program or medial professional staff will advise and assist in securing treatment. ...

Any employee returning from rehabilitation will be required to participate in [an Exxon]-approved after-care program. If an employee violates provisions of the Employee Alcohol and Drug Use Policy, appropriate disciplinary action will be taken. Such action cannot be avoided by a request at that time for treatment or rehabilitation. If an employee suffering from alcohol or drug dependency refuses rehabilitation or fails to respond to treatment or fails to meet satisfactory standards of effective work performance, appropriate disciplinary action, up to and including termination, will be taken. This policy does not require and should not result in any special regulations, privileges, or exemptions from normal job performance requirements.

[Exxon] may also require employees to submit to medical evaluation or alcohol and drug testing where causes exists [sic] to suspect alcohol or drug use.

Alcohol and Drug Policy at 1.

### 2. *The Human Affairs International, Inc. Extended After–Care Contract*

Individuals who participate in the extended after-care program (the "Extended After–Care Program") discussed in the Alcohol and Drug Policy are required to execute a document known as the Human Affairs International, Inc. ("HAI") Extended After–Care Contract (the "HAT After–Care Contract"). *See* HAI After–Care Contract, attached to Exxon Appendix, Exhibit 1C. Pursuant to the HAI After–Care Contract, the employee agrees, *inter alia,* to: (1) totally abstain from alcohol and drug use; (2) participate in treatment for chemical dependency for a minimum of two years; (3) immediately inform a sponsor, such as Alcoholics Anonymous ("AA"), Narcotics Anonymous ("NA") or Cocaine Anonymous ("CA"), the HAI Counselor and Exxon Health Services or his or her supervisor when stressful situations arise that endanger his or her sobriety; and (4) attend support group meetings, such as AA, NA or CA. *See* HAI After–Care Contract at 1.

The HAI After–Care Contract further provides that "[f]ailure to follow this procedure, or failure to follow the recommended counseling and continuing care meetings of [the] HAI After–Care Contract, or performance problems will result in discipline which may include termination of [ ] employment." HAI After–Care Contract at 3. The HAI After–Care Contract reminds the signatory that "a positive alcohol or drug test result or refusal to submit to periodic testing is grounds for discipline as referenced in Exxon's Alcohol and Drug Use Policy." HAI After–Care Contract at 3.

### C. *Employment History of Robert George*

In 1994, Robert George ("George") was employed by Exxon as an Assistant Operator–Blender ("Blender") at the Bayway

Chemical Plant in Linden, New Jersey (the "Chemical Plant"). The Chemical Plant is situated on approximately thirty-five acres in a petroleum refinery owned and operated by the Bayway Refining Company (the "Bayway Refining Company"). Affidavit of William A. Goodhart (the "Goodhart Aff."), attached to Exxon Appendix, Exhibit 16, ¶ 3. On average each day, there are in excess of 1000 workers, including employees and contractors, on site at the Chemical Plant and Bayway Refining Company. *Id.* at ¶ 3. At the Chemical Plant, there are eleven process sections and hundreds of miles of piping through which volatile petrochemical products are transported. *Id.* at ¶ 4.

As a Blender, George transferred volatile petrochemical products, ranging from 250 to 300 degrees and at pressures up to 150 pounds per square inch. *Id.* at ¶ 6. George transferred volatile petrochemical products to tanks ranging in size from 8,000 up to 250,000 gallons. George transferred approximately 285,000 gallons of volatile high temperature and high pressurized products each shift. *Id.* George was also responsible for shutting down a unit in the event of an emergency. *Id.* George transferred volatile petrochemical products from the manufacturing side of the Chemical Plant to the tankage area of the blending unit, located on the opposite side of the plant. *Id.*

### 1. *Accidents at the Chemical Plant*

On 13 February 1988, George, while working as an operator, connected steam and began heating a tank car containing 23,000 gallons of a thermally sensitive lubrication oil additive in violation of the Chemical Plant's policy (the "13 February 1988 Accident").[2] As a result of heating the additive, the mixture thermally decomposed sending a cloud of hydrogen sulfide and alkyl mercaptans across many New Jersey communities. As a result of the incident, Exxon was forced to undertake extensive clean-up and remediation of the decomposed material. Goodhart Aff. at ¶ 5.

In 1993, George was responsible for several work and safety related incidents, including overfills and spills from chemical storage tanks. *Id.* at ¶ 8. George's supervisor, Brian Codd ("Codd"), counseled him on numerous occasions as to his unsatisfactory work performance. Testimony of Brian Codd, Transcript of Arbitration Proceeding, attached to Exxon Appendix, Exhibit 15 at 47 (the "Codd Testimony").

On 26 July 1993, George overfilled Tank 634, a 150,000 gallon vessel, with zinc dialkyl dithil phosphate, resulting in a loss of 100 to 200 gallons of product into the environment (the "26 July 1993 Tank Overfill"). *See* Letter, dated 13 August 1993, from Codd to George, attached to Exxon Appendix, Exhibit 8 (the "13 August 1993 Letter"); Codd Testimony at 47. The 13 August 1993 Letter was a "warning letter" describing the 26 July 1993 Tank Overfill "as a result of [George] not following proper procedures." 13 August 1993 Letter. The 13 August 1993 Letter also noted "you [George] have also been counseled several times for your failure to report to work on time." *Id.*

Codd testified in the Arbitration Proceeding that he questioned George on several occasions regarding his behavior, including arriving to work late and leaving early, wearing sunglasses during work, appearing to sleep on the job, and his confrontational attitude. Codd Testimony at 46–49. Codd suggested to George that he seek help from Exxon's Medical Department (the "Medical Department") "if [George] did have some

---

**2.** Local 877 asserts there was no testimony or evidence introduced during the arbitration proceeding (the "Arbitration Proceeding") regarding the 13 February 1988 Accident. *See* Local 877 Reply Brief at 3. A court must take the facts as found by the arbitrator. A court may not "second-guess[ ] the arbitrator's fact-finding, particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator." *Exxon I,* 993 F.2d at 360 (quoting *United States Postal Serv. v.* *Nat'l Assn. of Letter Carriers,* 839 F.2d 146, 148 (3d Cir.1988)); *see also United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) ("[t]he courts are not authorized to reconsider the merits of an award even though the parties may allege the award rests on errors of fact or misinterpretation of the contract"). The 13 February 1988 Accident is discussed as part of George's employment history, but it was not used to review the validity of the Arbitration Award.

kind of problem and he didn't want to discuss it with [Codd]." Codd Testimony at 51.

### 2. *Admission of Drug Use by George*

On 3 February 1994, George went to the Medical Department, admitted he had a problem with cocaine and marijuana, and asked for help. Testimony of Ellen Confer, R.N. (the "Confer Testimony"), Transcript of Arbitration Proceeding, attached to Exxon Appendix, Exhibit 15 at 66. George was placed on medical leave and entered an outpatient rehabilitation facility. Confer Testimony at 66.

In March 1994, George returned to work while continuing rehabilitative activities in the Extended After–Care Program. Arbitration Opinion and Award (the "Arbitration Opinion") at 4. On 16 March 1994, George executed an HAI After–Care Contract which was also signed by Codd and Richard Cadema ("Cadema"), the HAI counselor. The HAI After–Care Contract required that George totally abstain from the use of alcohol and non-prescription drugs, immediately inform his Sponsor, his HAI counselor and Exxon Health Services or his Supervisor if "[his] work or home situation becomes stressful enough to endanger [his] sobriety," to attend "12 Step Support Group meetings," and to attend "Guided Life Structures" activities on a regular basis. *See* HAI After–Care Contract, attached to Exxon Appendix, Exhibit 1C. Also on 16 March 1994, George signed an after-care plan agreement (the "After–Care Plan Agreement"), which provided:

> I understand total abstinence from all drugs/alcohol is expected and that any relapse must be communicated to my HAI Counselor and my Supervisor or the Exxon Medical Department immediately. Failure to follow this procedure, or failure to follow the recommended counseling and continuing care meetings of my HAI After–Care Contract, or performance problems will result in discipline which may include termination of employment.

After–Care Plan Agreement, attached to Exxon Appendix, Exhibit 1C.

### 3. *George's Return to Work at Exxon*

On 16 March 1994, George asked if he could return to work. *See* Arbitration Opinion at 4. On the same day, George requested that he be tested for drug use on 21 March 1994 instead of 17 March 1994, because he had used cocaine that Sunday and was afraid he would test positive for drug use. Confer Testimony at 69. After discussing the request with the HAI counselor and with Exxon's Medical Director (the "Medical Director"), postponement was agreed upon and it was further agreed that further counseling sessions would be added to George's schedule. Arbitration Opinion at 5–6. George returned to work on 21 March 1994, and results from a drug test taken that day were negative. *Id.* at 6.

For several months following George's return to work, the results of his random drug tests were all negative. Arbitration Opinion at 6. However, in July 1994, Corning Nichols Institute ("Corning Nichols"), a substance abuse testing laboratory, reported to Exxon that a urine specimen George submitted for testing on 7 July 1994 (the "7 July 1994 Specimen") indicated dilution and the specimen had an odor of bleach. *Id.* When George was confronted with these findings, he offered no explanation. *Id.* After the 7 July 1994 Specimen, George was retested and the results were negative. Confer Testimony at 99.

During a drug test administered 3 January 1995 (the "3 January 1995 Specimen"), George gave a urine specimen that registered a temperature of 102 degrees. Arbitration Opinion at 6. As a result of the abnormally high temperature, a second specimen was obtained and both were sent to Corning Nichols. *Id.;* Confer Testimony at 97. Exxon received results showing both specimens were negative, but there was an indication that one of the two specimens had been adulterated. Arbitration Opinion at 6.

When George was confronted with these test results at a meeting on 30 January 1995, he admitted having added bleach to the 7 July 1994 Specimen[3] because he had been

---

**3.** The Arbitration Opinion states "[George] admitted having added bleach to the first specimen

consuming alcohol and was concerned he would fail the test. Confer told George that the urine specimen was used only for drug testing and that he had passed the breathalyzer test for alcohol on 3 January 1995. Confer Testimony at 101. At this meeting, George also admitted he had not regularly attended his required AA support meetings and had missed several sessions with his counselor. *Id.*

### 4. The 31 May 1995 Specimen

On 31 May 1995, the Medical Department requested George participate in another drug test. Arbitration Opinion at 7. Confer testified that Mary Cathrin Crowley, R.N. ("Crowley") told her George's response to several attempts to have him tested was that he was too busy and no one was there to relieve him. *Id.* Confer stated she and Crowley agreed that Crowley would call Codd and seek his assistance in getting George to the Medical Department for a test. *Id.* Codd testified he received Crowley's call and he directed George to go to the Medical Department. *Id.*

George gave a urine specimen (the "31 May 1995 Specimen") at three o'clock in the afternoon (the "31 May 1995 Drug Test"). Testimony of Crowley (the "Crowley Testimony"), Transcript of Arbitration Proceeding, attached to Exxon Appendix, Exhibit 15 at 165. A witness observed George while he provided the sample. Crowley testified the collection and initial screening procedures were conducted in a normal manner, that the packaging process was completed in the usual fashion and that the sealed and packaged specimen was placed in a refrigerator. Crowley Testimony at 167–68, 173. The 31 May 1995 Specimen remained in the refrigerator until a courier from Corning Nichols arrived to pick it up. Arbitration Opinion at 8. The courier logged in his pick up of the specimen. *Id.*

James Callies ("Callies"), Scientific Director of the Substance Abuse Testing Laboratory of Corning Nichols, testified in the Arbitration Proceeding that laboratory procedures require any indication of defect or break in the seal of a specimen eliminates that specimen from the testing process. Testimony of Callies (the "Callies Testimony"), attached to Exxon Appendix, Exhibit 15 at 126. Callies testified he had examined the laboratory files with respect to its processing of the specimen designated "Specimen ID: 0001316937" in the chain of custody documentation (the "31 May 1995 Specimen Documentation") that accompanied it. Arbitration Opinion at 9.

Callies stated the 31 May 1995 Specimen Documentation noted the specimen was given on 31 May 1995 and received by the laboratory on 3 June 1995; the laboratory report showed a positive test result for cocaine. The 31 May 1995 Specimen Documentation indicated the result was sent to Exxon on 6 June 1995, and a second report was sent on 8 June 1995. Arbitration Opinion at 9. Callies pointed out the 8 June 1995 report was requested by Exxon and sent under a separate accession number. The accession number is the number assigned by the laboratory after the specimen is received. Callies Testimony at 126. The results of the 31 May 1995 Drug Test showed George's urine specimen had a cocaine metabolite quality of 3040 nanograms per milliliter.

At the Arbitration Proceeding, Exxon also submitted a certification of Dr. Donald Shu ("Shu"), a Corning Nichols scientist, who confirmed the positive test for cocaine. *See* Certification of Shu (the "Shu Certification"), attached to Exxon Appendix, Exhibit 14.

Dr. David C. Shepperly ("Shepperly"), the Medical Director, testified that he met with George and a representative of Local 877 on 6 June 1995. Testimony of David C. Shepperly (the "Shepperly Testimony"), attached to Exxon Appendix, Exhibit 15. When confronted with the results of the positive test results, George first suggested the positive result could have resulted from medications he was taking that were listed on his drug-testing form. Arbitration Opinion at 10.

---

he had provided on 3 January because he had been consuming alcohol and was concerned he would fail the test." Arbitration Opinion at 7. Confer's testimony makes clear that George's ad-

mission of adding bleach referred to the 7 July 1994 Specimen, not the 3 January 1995 Specimen. This factual mistake, however, is not relevant to the Arbitrator's decision.

After George was told that none of these medications would have caused him to test positive for cocaine, George stated he had attended a Memorial Day party on 29 May 1995, and the soda he had been drinking may have been "spiked" with drugs without his knowledge. *Id.* Shepperly testified that the test reading of 3040 nanograms per milliliter reflected that George ingested enough cocaine to render him "significantly impaired," euphoric, with numbness and tingling around his mouth and tongue. Shepperly Testimony at 196–97.

On 6 June 1995, George was suspended without pay pending completion of an investigation. Arbitration Opinion at 11. On 12 June 1995, after the investigation was complete, Exxon terminated George from employment. *Id.*

As a result of the discharge of George, Local 877 filed a grievance. *See* Grievance Forms (the "Grievance Forms"), attached to Exxon Appendix, Exhibit 4. When the parties were unable to resolve the matter through the Grievance Procedure, the matter was submitted to arbitration.

### D. *Arbitration*

The Arbitration Proceeding was held on 27 and 30 September 1996 before Arbitrator Herbert L. Haber (the "Arbitrator"). *See* Transcript of Arbitration Proceeding. On 10 March 1997, the Arbitrator issued the Arbitration Opinion. *See* Arbitration Opinion.

The Arbitration Opinion noted that in resolving disputes involving the discharge of employees for substance abuse, arbitrators usually hold employers to a higher standard of proof than is generally applied. *See* Arbitration Opinion at 15–16. The Arbitration Opinion pointed to literature indicating that the employer should establish beyond a reasonable doubt the existence of a strict chain of custody of the specimen being tested and also the use of appropriate and adequate quality control procedures. *Id.*

The Arbitrator expressly found that Exxon had "met the standard of proof with regard to the quality and procedures of [Corning] Nichols Laboratory." Arbitration Opinion at 15. Further, the Arbitrator found explanations offered by George for testing positive were "implausible and unbelievable." *Id.* at 17. The Arbitrator also found that the "forbearance [of Exxon] in the face of ... [George's] violations, as well as the instance of his lapses in attendance at AA and counseling sessions and his failure to report these infractions, reflects its support of its program and of [George]." *Id.* at 16–17.

The Arbitrator found, however, that Exxon failed to establish the chain of custody of the 31 May 1995 Specimen. *See* Arbitration Opinion at 15. The Arbitrator ruled "the chain is broken by the absence of any signature certifying receipt and proper testing at the Laboratory following the existing certifications by the Donor and Collector." *Id.* The chain of custody procedure requires a certification signed by the donor, the collector of the specimen, and the laboratory receiving and testing the donor's specimen. *See* Non–Federally Mandated Chain of Custody Document/Request Forms (the "Chain of Custody Form"), attached to Greder Aff., Exhibit B. To establish the chain of custody, the Arbitrator determined Exxon was required to present testimony by witnesses in the chain of custody, or at least must "[present] an unbroken paper trail of identifiable certifications at the various steps in the process." Arbitration Opinion at 15. At the conclusion of the Arbitration Opinion, the Arbitrator states:

> [Exxon] did not have just cause for the discharge of Robert George and he is to be reinstated to employment with full seniority.
>
> The reinstatement of the grievant Robert George shall be without back pay.

*Id.* at 17.

### *Discussion*

#### A. *Summary Judgment Standard*

Both Exxon and Local 877 agree summary judgment is appropriate to resolve the present dispute. To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material

fact exist and, if not, whether Defendants are entitled to judgment as a matter of law. A District court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.*, 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party'") (citations omitted)

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1265 (1992); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

"[T]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Gomez v. Allegheny Health Serv., Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *accord Siegel Transfer, Inc. v. Carrier Express, Inc. et al.*, 54 F.3d 1125, 1130–31 (3d Cir.1995); *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp.

525, 534 (D.N.J.1989), *aff'd without op'n*, 899 F.2d 1218 (3d Cir.1990).

"The nonmoving party creates a genuine issue of material fact if [she or he] provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.1995) (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of her or his case upon which she or he will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265; *Brewer*, 72 F.3d at 330; *Siegel*, 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

### B. *Reviewing Arbitration Awards*

#### 1. *The Judicial Role*

Courts play a limited role in reviewing arbitration awards. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. at 36, 108 S.Ct. at 369–370; *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir.1996) ("*Exxon III*"), *cert. denied sub nom. Seariver Maritime, Inc. v. Exxon Seamen's Union*, —— U.S. ——, 116 S.Ct. 2515, 135 L.Ed.2d 203 (1996); *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 359 (3d Cir.1993) ("Exxon I"); *Exxon Corp. v. Esso Workers' Union, Inc.*, 118 F.3d 841, 844 (1st Cir.1997); *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996); *Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. 1379, 1384 (D.N.J. 1992), *aff'd*, 11 F.3d 1189 (3d Cir.1993); *Exxon Shipping Co. v. Exxon Seamen's Union*, 788 F.Supp. 829, 834 (D.N.J.1992), *aff'd*, 993 F.2d 357 (3d Cir.1993). The general rule is that a court must enforce an arbitration award "if it is based on an arguable interpretation of the collective bargaining agreement, and [a court] may only vacate an award if it

is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement." *Exxon Shipping III*, 73 F.3d at 1291 (quoting *News America Publications, Inc. Daily Racing Form Division v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir.1990) ("*News America Publications I* ") (citations omitted)); *accord Exxon I*, 993 F.2d at 360.

If a court finds the arbitrator "arguably construed or applied the contract," the court must enforce an award "regardless of the fact that, a court is convinced the arbitrator has committed serious error." *News America Publications I*, 918 F.2d at 24 (citing *Misco*, 484 U.S. at 38, 108 S.Ct. at 370–371). Neither a court's disagreement with the arbitrator's construction of a contract nor its belief that its interpretation of a contract is better justifies a court overruling the arbitrator. *News America Publications I*, 918 F.2d at 24; *see also Eichleay Corp. v. International Ass'n of Bridge Structural and Ornamental Iron Workers*, 944 F.2d 1047, 1056 (3d Cir.1991).

The instances in which a court can vacate an arbitration award are narrow. The vacating of an arbitration award is justified where an arbitrator has ignored the plain language of the contract or if the arbitrator's decision is unsupported by principles of contract construction. *News America Publications v. Newark Typographical Union, Local 103*, 921 F.2d 40, 41–42 (3d Cir.1990) ("*News America Publications II* "). Vacating an award is also proper if the award "does not draw its essence from the collective bargaining agreement," *Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers of America*, 896 F.2d 745, 747–48 (3d Cir.1990), or if the arbitrator substitutes his or her own notions of "industrial justice" for the terms of the bargaining agreement. *Pennsylvania Power Co. v. Local Union No. 272 of Int'l Bhd. Of Elec. Workers*, 886 F.2d 46, 49 (3d Cir.1989); *see also Stroehmann Bakeries v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441 (3rd Cir.1992), *cert. denied*, 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992); *Eichleay Corp.*, 944 F.2d at 1050; *Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. at 1384 (D.N.J.1992); *Exx-on Shipping Co. v. Exxon Seamen's Union*, 788 F.Supp. at 835.

Deference to arbitration awards serves to "promote the benefits of labor arbitration—speed, flexibility, informality and finality." *Exxon I*, 993 F.2d at 360 (citing *Penntech Papers, Inc. v. United Paperworkers Int'l Union*, 896 F.2d 51, 53 (3d Cir.1990)); *accord Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. at 1384; *Exxon Shipping Co. v. Exxon Seamen's Union*, 788 F.Supp. at 834. "[T]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Exxon III*, 73 F.3d at 1291 (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960)); *see also Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers*, 896 F.2d at 747 (deference supported by preference in federal statutes governing labor-management relations for the private resolution of labor disputes); *Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. at 1384. As well, a court can vacate an arbitration award if it is contrary to a well-defined and dominant public policy. *See infra* at 761.

### 2. *The Public Policy Exception*

A court may vacate an arbitration award if it is found that the award violates a "well-defined and dominant" public policy. *Exxon III*, 73 F.3d at 1291 (quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (citations omitted)); *United Paperworker's Int'l Union v. Misco*, 484 U.S. at 29, 108 S.Ct. at 364–366; *Exxon Shipping Co. v. Exxon Seamen's Union*, 11 F.3d 1189, 1191–94 ("*Exxon II*"); *Exxon I*, 993 F.2d at 360; *Exxon Corp. v. Esso Worker's Union*, 118 F.3d at 844–852; *Exxon Corp. v. Baton Rouge Oil and Chemical Workers Union*, 77 F.3d at 853–54; *Gulf Coast Industrial Workers Union v. Exxon Co.*, 991 F.2d at 248; *G.B. Goldman Paper Co. v. United Paperworkers Int'l Union, Local 286*, 957 F.Supp.

607, 617–620 (E.D.Pa.1997); *Exxon Shipping Co. v. Exxon Seamen's Union,* 801 F.Supp. at 1384–85; *Exxon Shipping Co. v. Exxon Seamen's Union,* 788 F.Supp. at 837.

A well-defined and dominant public policy can be "ascertain[ed] by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Exxon Shipping I,* 993 F.2d at 360 (quoting *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183); *accord United Trans. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 381 (3d Cir.1995); *Exxon Shipping Co. v. Exxon Seamen's Union,* 788 F.Supp. at 837; *Exxon Shipping Co. v. Exxon Seamen's Union,* 801 F.Supp. at 1384–85.

In order to apply the public policy exception, a court must first determine whether a well-defined and dominant public policy exists. *Exxon III,* 73 F.3d at 1291. Once the public policy is identified, "the court must determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated the public policy." *Id.* at 1292.

In determining whether the arbitrator's award violated public policy, the court may not "second guess[ ] the arbitrator's fact-finding" particularly when finding a violation of public policy "depends on drawing factual inferences not made by the arbitrator." *Exxon I,* 993 F.2d at 360 (quoting *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers,* 839 F.2d at 148). Although courts are cautioned to limit the use of general notion of public policy, "the question of public policy is ultimately one for resolution by the courts." *Exxon Shipping Co. v. Exxon Seamen's Union,* 801 F.Supp. at 1385 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183).

The enforcement of an arbitration award does not have to violate a positive law in order to be found to violate public policy. *See Exxon II,* 11 F.3d at 1192. In *Stroehmann Bakeries,* the Third Circuit held that "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." 969 F.2d at 1436. The court determined that a well-defined and dominant public policy against

reinstating this employee existed without identifying any statute, regulation or court decision that made the reinstatement of the employee illegal. The *Stroehmann Bakeries* decision "implicitly rejected the argument that an arbitration award may be vacated on public policy grounds only when the award requires conduct that is prohibited by positive law." *Exxon II,* 11 F.3d at 1192.

### C. *Arbitrator's Scope of Authority*

Exxon argues the Arbitrator exceeded the scope of his authority because (1) the Arbitrator's ruling of a broken chain of custody regarding George's test result is a manifest disregard of the CBA, Exxon Support Brief at 25; and (2) he had no discretion under the CBA to "change the discipline" by modifying "the terms and conditions of George's employment as set forth in the Alcohol and Drug Policy and the HAI After-Care Contract." *Id.* at 22.

#### 1. *Ruling on the Chain of Custody*

Exxon argues the ruling by the Arbitrator of a broken chain of custody for the 31 May 1995 Specimen is a "manifest disregard of the CBA." *See* Exxon Support Brief at 25. Specifically, Exxon asserts: (1) the Arbitrator improperly ignored the testimony of witnesses who attested to the accuracy of the 31 May 1995 Drug Test results; and (2) the Arbitrator implicitly found George tested positive for cocaine because the Arbitrator refused to extend back pay to George. *See* Exxon Support Brief at 25–26.

■■■ The Arbitrator determined the beyond a reasonable doubt standard applied to disputes where the employer is seeking to terminate an employee based on a positive drug test. *See* Arbitration Opinion at 16 ("employers are expected to establish beyond a reasonable doubt not only the existence of a strict chain of custody of the specimen being tested but the security of the testing laboratory and the use of appropriate and adequate quality control procedures, and of legally defensible (forensic) analytical procedures as well"). The Arbitrator noted that "arbitrators usually hold employers to a higher level of proof than normally applied,

particularly in the area of the testing procedures that provide the results upon which the discharge is based." Arbitration Opinion at 15.

Local 877 argues in support of the Arbitrator's ruling by pointing to regulations regarding drug testing. Local 877 Support Brief at 24–25. Local 877 asserts these regulations set forth a detailed chain of custody procedure. *See Id.* (citing Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 FR 11980, issued by the Department of Health and Human Services, as revised 59 FR 29908; Procedures for Transportation Workplace Drug Testing Programs, 49 C.F.R. § 40.1 et seq.).

In support of the integrity of the 31 May 1995 Specimen, Exxon presented the Shu Certification and several witnesses, including Crowley and Callies. Crowley testified that the collection and initial screening procedures were conducted in a normal manner, the packaging process was completed in the usual fashion and the sealed and packaged specimen was placed in the refrigerator. *See* Crowley Testimony at 167–68, 173. Callies testified that standard laboratory procedures require that any indication of defect or a break in the seal of a specimen eliminates such specimen from the testing process. *See* Callies Testimony at 126. The Shu Certification confirmed that the 31 May 1995 Specimen tested positive for cocaine metabolites. *See* Shu Certification.

After hearing the witnesses and reviewing the submissions, the Arbitrator nevertheless concluded "the chain [of custody] is broken by the absence of any signature certifying receipt and proper testing at the Laboratory following the existing certifications by the Donor and Collector." Arbitration Opinion at 15.

Local 877 contends that the Arbitrator's use of the beyond a reasonable doubt standard is appropriate because the charge or use of possession of drugs is a criminal offense. *See* Local 877 Support Brief at 20–21. The authority relied upon by Local 877 states that while the modern trend in arbitration is to use the clear and convincing evidence standard, the beyond a reasonable doubt standard is often used "in discharge cases involving the use of drugs or other conduct that would constitute criminal activity." Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works* 413, 907 (5th ed.1997). A more complete review of this text, however, shows that "a number of arbitrators apply a lesser standard when the criminal drug usage manifests itself as a violation of company rules." Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works,* at 907.

A different authority was cited in the Arbitration Opinion for the proposition that "employers are expected to establish beyond a reasonable doubt not only the existence of a strict chain of custody of the specimen being tested but the security of the testing laboratory and the use of appropriate and adequate quality control procedures." Arbitration Opinion at 15 (citing Tia Schneider Denenberg and R.V. Denenberg, *Alcohol and other Drugs: Issues in Arbitration* (1991)). A review of this text reveals a more limited proposition: "[a] perennial issue in discharge cases [based on alcohol and drug use] is the quantum of proof required to establish just cause and support the discipline imposed." Tia Schneider Denenberg and R.V. Denenberg, *Alcohol and other Drugs* at 251. Simply stated, the Arbitrator was not required to use the beyond a reasonable doubt standard.

It is arguable, nevertheless, that the Arbitrator's application of the beyond a reasonable doubt standard is entitled to deference. A court must enforce an arbitration award if it finds the arbitrator "arguably construed or applied the contract ... regardless of the fact that the court is convinced the arbitrator has committed serious error." *News America Publications I,* 918 F.2d at 24. A court must enforce the award unless it finds the Arbitrator was substituting his own notions of "industrial justice" for the terms of the CBA. *See Pennsylvania Power Co.,* 886 F.2d at 49; *Stroehmann Bakeries,* 969 F.2d at 1441; *Eichleay Corp.,* 944 F.2d at 1050; *Exxon Shipping Co.,* 801 F.Supp. at 1384. Because the decision on these motions is based upon public policy considerations, *see infra* at 764–767, it is not necessary to decide this issue.

## 2. *Alleged Modification of the Terms and Conditions of George's Employment*

Exxon states the CBA "allows [Local 877] to file a grievance challenging the 'reasonableness' of George's discharge in light of his positive cocaine test." Exxon Support Brief at 23. Specifically, Exxon points to the language of Art. 29 of the CBA: "[i]f [Local 877] claims the discipline ... is not reasonable, then the reasonableness of the discipline is a grievance." Art. 29.

Exxon contends the Arbitrator determined that Exxon acted reasonably under the CBA and therefore found that Exxon had reasonable cause to discharge George. *See* Exxon Support Brief at 24. Specifically, the Arbitrator found: (1) Exxon met the standard of proof with regard to the quality and procedures at Corning Nichols; (2) George's "implausible and unbelievable explanation for having tested positive for cocaine on May 31, 1995 justified [Exxon] concluding that he has 'failed to respond' and determining to discharge him;" and (3) the admission by George that he tampered with the 7 July 1994 Specimen constituted a constructive refusal to take a drug test. Arbitration Opinion at 15, 17. Exxon appears to argue the reasonableness of the discharge of George should be based upon the circumstances surrounding the 31 May 1995 Drug Test, including the 7 July 1994 Specimen suspected of adulteration.

Exxon terminated George for violating Posted Offense Number 30, entitled: "Testing positive on a drug or alcohol test or refusal to submit to a drug or alcohol test." Arbitration Opinion at 2. In the Arbitration Opinion, the Arbitrator limited his review assessing the reasonableness of the termination based upon the positive test result for the 31 May 1995 Specimen. The Arbitrator determined that Exxon must prove the results of the 31 May 1995 Drug Test were valid before determining the termination of George was reasonable.

The Arbitrator specifically rejected the results of the 31 May 1995 Drug Test, which the Arbitrator stated was the basis for George's termination. The Arbitrator stated: "While [Exxon] has met the standard of proof with regard to the quality and procedures of [Corning Nichols] through Callies' testimony, the same may not be said with regard to the chain-of-custody." Arbitration Opinion at 15.

■ As discussed, when reviewing an arbitration award, a court can decide the arbitrator exceeded his or her authority only when he or she ignored the plain language of the contract or if the decision is unsupported by principles of contract construction. *See News America Publications,* 921 F.2d at 41–42; *Tanoma Mining Co.,* 896 F.2d at 747; *Stroehmann Bakeries,* 969 F.2d at 1449. A court should not vacate an arbitration award simply because it disagrees with the contract interpretation. Rather, a court should determine whether the arbitrator's reading of the contract is "plausible." *Exxon Corp. v. Esso Workers' Union, Inc.,* 118 F.3d at 845 (citing *El Dorado Technical Servs. v. Union General De Trabajadores de Puerto Rico,* 961 F.2d 317, 320 (1st Cir.1992)); *see also Misco,* 484 U.S. at 38, 108 S.Ct. at 370–371 (as long as arbitrator arguably construes the contract, the award must be enforced); *News America Publications,* 921 F.2d at 41.

The plain language of Posted Offense No. 30 shows that Exxon was allowed to terminate George for testing positive on a drug or alcohol test or *"refusal to submit to a drug or alcohol test." Id.* (emphasis added). The Arbitrator considered George's confirmation that he had tampered with the 7 July 1994 Specimen to be a "constructive refusal" to take the drug test. Arbitration Opinion at 16.

The Arbitrator, however, subjected Posted Offense No. 30 to a distinctly narrow interpretation when he determined he was limited to deciding the reasonableness of the termination based solely on the 31 May 1995 Drug Test. This is not a plausible interpretation of a provision that includes two clauses allowing for termination: (1) a positive drug test; or (2) refusal to submit to a drug or alcohol test. *See* Posted Offense No. 30. By ignoring the plain language of the CBA and by neglecting basic principles of contract construction, it appears the Arbitrator exceeded his authority when he reinstated George to his position as Blender. It is not necessary to decide this

issue because the decision on these motions is based upon public policy considerations, *see infra* at 764–767.

### D. *Public Policy Considerations*

█ Exxon's primary argument is that George's reinstatement violated the well-defined and dominant public policy of preventing the performance of safety-sensitive duties while under the influence of drugs or alcohol. Exxon Support Brief at 10. As discussed, in order to vacate an arbitration award under the public policy exception, a court must first determine whether such policy exists. *Exxon III*, 73 F.3d at 1291. After determining a well-defined and dominant public policy exists, the court must determine whether the arbitrator's award violated the public policy. *Id.* at 1292.

#### 1. *Identification of a Well–Defined and Dominant Public Policy*

##### a. *Case Law*

The Third Circuit has identified a broad public policy against permitting an individual to work in a safety-sensitive position while under the influence of drugs or alcohol, and regularly upholds decisions of District courts vacating arbitration awards reinstating these employees to their former positions. *See Exxon II*, 11 F.3d at 1194 (seaman intoxicated while on duty); *Exxon I*, 993 F.2d at 361–62 (positive test for marijuana use); *cf. Exxon III*, 73 F.3d at 1292 (affirming public policy, but reinstating pumpman who refused to submit to drug test because cause was not present to require test).

Other circuit courts agree there is a well-defined and dominant public policy against the performance of safety-sensitive jobs while under the influence of drugs or alcohol, and also regularly uphold decisions of District courts vacating arbitration awards reinstating employees who have tested positive for intoxicants. *See Exxon Corp. v. Esso Workers' Union, Inc.*, 118 F.3d 841 (1st Cir. 1997) (truck driver tested positive for cocaine); *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 855–56 (5th Cir.1996) (operations controller at chemical plant tested positive for cocaine); *Gulf Coast Indus. Workers Un-*

*ion v. Exxon Co., U.S.A.*, 991 F.2d 244, 252–53 (5th Cir.1993) (process technician at petrochemical refinery tested positive for cocaine), *cert. denied*, 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993).

The *Misco* Court framed the inquiry Federal courts should employ when an arbitration award is challenged on public policy grounds. *See Misco*, 484 U.S. at 42–44, 108 S.Ct. at 373–374. In *Misco*, an employee, Isaiah Cooper ("Cooper"), who worked for a paper converting plant, was found by police during work hours "in the backseat of [a] car with marijuana smoke in the air and a lighted marijuana cigarette in the front seat ashtray." *Id.* at 33, 108 S.Ct. at 368. The company fired Cooper for breaking its rule against possessing illegal drugs on business premises. After the arbitrator ordered reinstatement, the company filed suit in District court to vacate the arbitration award because it violated public policy. The District court vacated the award and the Court of Appeals affirmed. *Id.* at 35, 108 S.Ct. at 369.

The Supreme Court reversed the Court of Appeals, finding "the Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a well-defined and dominant public policy against the operation of dangerous machinery while under the influence of drugs." *Id.* at 44, 108 S.Ct. at 373. Because the lower courts had predicated their perceptions of public policy on intuition rather than on positive law, the judgment was reversed. *Id.* at 45, 108 S.Ct. at 374. *Misco* left open the question whether an arbitration award may be set aside on public policy grounds only when the award violates positive law. *See Exxon II*, 11 F.3d at 1192.

Following *Misco's* analysis, the Third Circuit in *Exxon I* affirmed this court's opinion in *Exxon Shipping Co. v. Exxon Seamen's Union*, 788 F.Supp. at 829. *See Exxon I*, 993 F.2d at 357. The Circuit affirmed this court's refusal to enforce an arbitration award directing Exxon to reinstate a seaman, Morris Foster ("Foster"), who tested positive for marijuana after his ship ran aground. *Id.* at 361–62. The results of the drug test were considered negative under the standards in the Coast Guard drug testing regu-

lations (the "Coast Guard Drug Testing Regulations"), and no federal or state statute forbade Exxon from continuing Foster's employment. *Id.* at 358 & n. 1.

The Third Circuit discussed this court's opinion, which had vacated the arbitration award by finding a strong public policy against having "drug users operate commercial vessels." *Exxon Co. v. Exxon Seamen's Union,* 788 F.Supp. at 843. This court looked to the Coast Guard Drug Testing Regulations and found Foster's reinstatement undermined "the underlying efforts to keep drug users from operating commercial vessels." *Id.* at 843. The Circuit agreed and determined that the reinstatement of Foster would contravene the public policy embodied in the Coast Guard Drug Testing Regulations, that of safe operation of vessels, even though Foster did not technically violate the Coast Guard Drug Testing Regulations. *See Exxon I,* 993 F.2d at 364.

During the litigation, the parties quibbled over whether public policy forbade drug use both on and off duty, but the Circuit held the more important purpose of the Coast Guard Drug Testing Regulations was to ensure employees did not operate vessels with impaired faculties. *Exxon I,* 993 F.2d at 361. The Circuit emphasized "the potentially disastrous effects of a major oil spill on the environment" and expressed concern over "seamen, operating vessels under the influence of drugs or alcohol." *Id.* at 367.

The Circuit observed that other courts have identified a well-defined and dominant public policy against reinstating common carriers discharged for drug and alcohol abuse. *Exxon I,* 993 F.2d at 363 (citing *E.I. DuPont de Nemours v. Grasselli Employees Indep. Ass'n of East Chicago,* 790 F.2d 611, 616 (7th Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986); *Iowa Elec. Light & Power Co. v. Local Union 204 of the, Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427 n. 2 (8th Cir.1987); *Bd. of County Comm'rs. v. L. Robert Kimball & Assocs.,* 860 F.2d 683, 686 (6th Cir.1988), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *United States Postal Serv. v. American Postal Workers Union,* 736 F.2d 822, 824 (1st Cir.1984)).

The Circuit determined the "sounder approach" to be the broad test of public policy, rather than requiring the enforcement award to violate a positive law before a court can vacate it. *Exxon I,* 993 F.2d at 363. Accordingly, the Circuit affirmed the vacation of the arbitration award reinstating Foster even though the reinstatement did not violate positive law.

In *Exxon II,* the Circuit affirmed this court's decision to set aside an arbitration award reinstating a seaman, Randall Fris ("Fris") who reported to work intoxicated. *See Exxon II,* 11 F.3d at 1194. The arbitration panel determined Fris was intoxicated when he boarded the ship, but concluded that he should be given an opportunity to demonstrate the one lapse was an aberration. *Id.* at 1191. This court vacated the award because it was contrary to "a well-defined and dominant public policy against having intoxicated persons operate commercial vessels." *Exxon Shipping Co. v. Exxon Seamen's Union,* 801 F.Supp. at 1388. This court based its finding on a Coast guard regulation prohibiting operation of a vessel while under the influence of drugs or alcohol, and "a myriad of regulations from various Government agencies concerning alcohol and drug use in the workplace." *Id.* at 1389.

The Third Circuit affirmed the finding of this court of a well-defined and dominant public policy "that an owner or operator of an oil tanker should not be compelled to reinstate to a 'safety-sensitive' position an individual who has been found to be intoxicated while on duty on that vessel." *Exxon II,* 11 F.3d at 1194. The Circuit determined the public policy emanated from Coast Guard regulations, and also observed that many Congressional statutes, including the Clean Water Act and the Oil Pollution Act of 1990, reflected a policy of preventing accidents and environmental degradation. *Id.* at 1194 (citing Clean Water Act, 33 U.S.C. § 1321(f); Oil Pollution Act of 1990, 33 U.S.C. § 2702). The Circuit observed that Exxon faced potential civil and criminal liability if an impaired employee caused an accident. *Id.* at 1195.

In *Exxon III*, decided in 1996, the Third Circuit upheld an arbitration award and reinstated an employee who refused to submit to a drug test. 73 F.3d at 1287. Significantly, the Circuit found the collective bargaining agreement did not require the employee to take a drug test. However, the Circuit stated that if there were cause to require the drug test, reinstatement of the employee after refusal to take the drug test would violate public policy. *Id.* at 1295. The court reiterated its holdings in *Exxon I* and *Exxon II*, where it recognized a "broad public policy against permitting an individual to operate a vessel while under the influence of drugs or alcohol." *Id.* at 1292. The Circuit stated:

> The force of our decisions in *Exxon I* and *[Exxon II]* would be radically undermined if we decline to take the logical next step and decide that reinstatement of an employee who refused to submit to a drug test upon a showing of reasonable cause violates public policy. Although Coast Guard regulations do not mandate discharge for an employee—even one in a safety-sensitive position—who refuses a drug test, we conclude that if Exxon had cause to require a test, [the employee's] reinstatement following his refusal would violate public policy because it would undercut enforcement of Coast Guard regulations and environmental statutes which denote a well-defined and dominant public policy against permitting intoxicated crew members to operate oil tankers and other common carriers.

*Exxon III*, 73 F.3d at 1294–95.

In *Exxon Corp. v. Esso Workers' Union*, 118 F.3d at 841–852, the First Circuit vacated an arbitration award reinstating a truck driver who tested positive for cocaine. In determining whether a well-defined and dominant public policy exists, the First Circuit stated:

> [S]ociety has achieved a broad national consensus that persons should not be allowed to endanger others while laboring under the influence of drugs. This consensus is made manifest by positive law [4] and translates into a well-defined and dominant public policy—indeed, a national crusade—counseling against the performance of safety-sensitive tasks by individuals who are so impaired.

*Id.*, 118 F.3d at 848.

The Union argued in *Exxon Corp. v. Esso Workers' Union* that reinstating the employee would not violate the public policy against the performance of safety-sensitive tasks by impaired individuals, because, despite the positive drug test, there was no evidence this employee was actually impaired at the time he was driving his truck. The First Circuit responded that this narrow argument "misses the mark." 118 F.3d at 849. The Circuit stated:

> The notorious mishap involving the Exxon Valdez, which produced vast environmental devastation, highlights the core problem associated with this "wait-and-see" approach. If we have learned anything from such catastrophes, it is that employers must act affirmatively to avoid drug-related accidents rather than wait passively for such accidents to happen.

> We conclude, therefore, that the well-defined and dominant public policy which we have identified does not require an employer to await the occurrence of an accident before discharging an employee who tests positive for drug use.

118 F.3d at 849.

The First Circuit also determined that public policy not only requires impaired em-

---

**4.** The First Circuit requires a court to "review existing statutes, regulations, and judicial decisions to ascertain whether they establish a well-defined and dominant public policy. If positive law does not give rise to such a policy, the inquiry is at an end. If however, [a] court finds that such a policy exists, it must then proceed to the second step of the pavane and determine whether the arbitral award clearly violates the discerned public policy." *Id.* 118 F.3d at 846 (citing *Misco*, 484 U.S. at 43–44, 108 S.Ct. at 373–374). It appears the First Circuit requires a finding of a violation of positive law before it determines that a well-defined and dominant public policy exists. This interpretation of *Misco* is contrary to the Third Circuit interpretation which allows a court to vacate an arbitration award even when the reinstatement does not violate positive law. *See Stroehmann Bakeries*, 969 F.2d at 1436; *Exxon I*, 993 F.2d at 363. The Third Circuit standard is discussed *infra* at 768–769.

ployees to refrain from performing safety-sensitive positions, "but also that employers develop (and enforce) programs designed to discourage such activity." 118 F.3d at 849. The Circuit found that "[the employee] transgressed the terms of [the drug-free program] three times over: failing to report his drug use to Exxon, falsely representing that he abjured illicit drugs, and testing positive for drug use." 118 F.3d at 851.

Other circuits have refused to enforce arbitration awards reinstating employees found to have been impaired on the job. *See Exxon Corp. v. Baton Rouge Oil and Chemical Workers Union*, 77 F.3d 850 (5th Cir.1996) (employee tested positive for cocaine); *Union Pacific R.R. Co. v. United Transp. Union*, 3 F.3d 255, 262 (8th Cir.1993) (employee tested positive for drug use after a switching accident), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994); *Gulf Coast Indus. Workers Union v. Exxon Company U.S.A.*, 991 F.2d 244 (5th Cir.1993) (employee tested positive for cocaine); *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local Union 540 v. Great Western Food Co.*, 712 F.2d 122, 125 (5th Cir.1983) (professional driver caught drinking on duty); *Delta Air Lines Inc. v. Air Line Pilots Ass'n Int'l*, 861 F.2d 665 (11th Cir.1988) (employee flew an aircraft while obviously drunk), *cert. denied*, 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989).

b. *Statutes, Regulations and Executive Orders*

In the instant matter, Exxon argues that "reinstatement of George subverts Exxon's Alcohol and Drug Policy and prevents Exxon from carrying out its obligation and duty to furnish a safe workplace." Exxon Support Brief at 12–13. Exxon points to numerous statutes, regulations and executive orders addressing the problem of drugs and alcohol in the workplace. *See* Exxon Support Brief at 19–21. There is abundant support for Exxon's proposition that a myriad of regulations from various Governmental agencies concern alcohol and drugs in the workplace, and demonstrate a well-defined and dominant public policy of ensuring a drug-free and safe workplace. *See e.g.,* Drug–Free Workplace Act of 1988, 41 U.S.C. § 701 et seq. (requiring all federal contractors and grantees to establish a drug abuse prevention program including education, counseling, and penalties for drug use); Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 651 et seq. (requiring employers "furnish to each of his [or her] employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his [or her] employees," 29 U.S.C. § 654(a)(1)); Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 2717; Guidelines for Nuclear Power Plant Drug and Alcohol Testing Programs, 10 C.F.R. § 26 (1991); Federal Aviation Administration Drug Testing Program, 14 C.F.R. § 121, Appendix I (1991); Procedures for Transportation Workplace Drug Testing Programs, 49 C.F.R. § 40.1 (1991) (Dep't of Transp.); Dep't of Defense Drug Abuse Testing Program, 32 C.F.R. § 60.1 (1991); Control of Alcohol and Drug Use: Procedures and Safeguards for Urine Drug Testing, 49 C.F.R. § 219, Appendix A (1991) (Federal Railroad Administration); Control of Drug Use in Mass Transportation Operations, 49 C.F.R. § 653.1 (1990) (Urban Mass Transportation Administration).

Exxon, in addition, is a contractor for the Department of Defense. Exxon Support Brief at 20. The Departments of Energy and Defense have promulgated regulations to ensure that safety-sensitive jobs are only performed by unimpaired individuals. *See* Submission, Approval and Implementation of Baseline Workplace Substance Abuse Program, 10 C.F.R. § 707.5 (Dep't of Energy); Drug–Free Workforce, 48 C.F.R. § 252.223–7004(c)(1) (Dep't of Defense). Contractors for these agencies must identify illegal drug users, including testing employees in safety-sensitive positions. *See id.*

2. *Application of the Well–Defined and Dominant Public Policy*

a. *Identification of Positive Law Not Required*

Local 877 argues that nothing in these regulations mandates Exxon discharge an employee who tests positive for drugs, or prohibits George's reinstatement to employ-

ment. Local 877 Support Brief at 23–24. This narrow interpretation of the public policy identified from these regulations, and the emphasis on identifying a positive law that forbids the conduct at issue, is misguided.

As discussed, the *Misco* Court left open the question of whether an arbitration award may be set aside on public policy grounds only when the award violated positive law. *See Exxon II,* 11 F.3d at 1192. The Third Circuit, however, has subsequently answered this question with a resounding "no." In *Stroehmann Bakeries,* 969 F.2d at 1436, the Circuit affirmed the District court's decision to vacate an arbitration award reinstating an employee accused of sexual harassment "without identifying any statute, regulation or court decision that made the reinstatement of the deliveryman—as opposed to the alleged sexual harassment—illegal." *Exxon II,* 11 F.3d at 1192.

In *Exxon I,* the Circuit upheld the vacation of an arbitration award "that did not require conduct that violated any statute, regulation, or other manifestation of positive law." *Exxon II,* 11 F.3d at 1192 (citing *Exxon I,* 993 F.2d at 363). A court need not find a violation of a "specific rule[ ] or prohibition." *Exxon I,* 993 F.2d at 364. The Circuit in *Exxon II* observed the Third Circuit is not alone in allowing courts to vacate arbitration awards even when reinstatement is not prohibited by positive law. *See Exxon II,* 11 F.3d at 1193–94 (citing *Gulf Coast Indus. Workers Union v. Exxon Co., U.S.A.,* 991 F.2d at 257; *Delta Air Lines,* 861 F.2d at 674–75; *Iowa Elec.,* 834 F.2d at 1430; *Amalgamated Meat Cutters v. Great Western Food Co.,* 712 F.2d at 125).

■ As the Third Circuit stated in dicta in *Exxon III,* "[t]he force of our decisions in *Exxon I* and *[Exxon II]* would be radically undermined if we decline to take the logical next step and decide that reinstatement of an employee who refused to submit to a drug test upon a showing of reasonable cause violates public policy." *Exxon III,* 73 F.3d at 1294–95. The same public policy applied in *Exxon III* applies to this case. The force of the decisions in *Exxon I* and *Exxon II* would be undermined by a requirement that a court find an explicit regulation that addresses the termination of employees who test positive for drugs.

**b.** *Well–Defined and Dominant Public Policy Not Limited to Safety–Sensitive Positions*

Local 877 argues that George was not employed in a safety-sensitive position and thus his case is distinguishable from the case law discussed above. Local 877 Reply Brief at 4–5. As part of the Alcohol and Drug Policy, Exxon states:

> [A]n employee who has had or is found to have a substance abuse problem will not be permitted to work in designated positions identified by management as being critical to the safety and well being of employees, the public, or [Exxon].

*See* Alcohol and Drug Policy. Local 877 points out that if George were in a position designated as safety-sensitive under the Alcohol and Drug Policy, he would not have been able to return to his previous position after his rehabilitation. *See* Local 877 Support Brief at 4. The Arbitrator did not state in the Arbitration Opinion whether George's job duties were safety-sensitive.

Both Codd and Herbert M. Armeny ("Armeny"), the Supervisor of the Blending and Shipping Department, testified in the Arbitration Proceeding that George was not working in one of positions designated under the Alcohol and Drug Policy as "critical to the safety and well being of employees, the public or [Exxon]." *See* Codd Testimony at 59–60; Testimony of Armeny, attached to Exxon Appendix, Exhibit 15 at 212–16 (the "Armeny Testimony").

Local 877's position is counter-intuitive in light of the job description of a Blender, and exalts form over substance. While working as a Blender in the Chemical Plant, George transferred 285,000 gallons of high temperature and high pressurized product each shift throughout the facility. *See* Gooder Aff. at ¶ 6. George's supervisor, Codd testified that as a Blender, George was responsible for large transfers of manufactured products, many of which "come out of their tankage at 300 degrees … at pressures up to ninety and one hundred pounds per square inch."

Codd Testimony at 45. He further testified that a Blender must be "pretty careful because there are some hazards involved." *Id.* at 45–46. George was not a desk-bound employee whose drug use *might* not mandate, as stringently, the vacating of the arbitration award as contrary to public policy. *See Exxon Shipping Co. v. Exxon Seamen's Union*, 788 F.Supp. at 846. As a Blender, George had a much greater potential to cause physical, environmental, or economic harm than the typical office worker.

Exxon's position that George had significant safety-sensitive responsibilities is furthered by the reality of accidents in which George was involved while working at the Chemical Plant. Even if these accidents can be attributed to simple human error and not to impairment by drugs or alcohol, the accidents demonstrate that as a Blender, George is capable of causing serious injury to others, serious damage to the environment and serious economic damage to Exxon as a result of mistakes. "Oil companies in general, and Exxon in particular, have been the subject of harsh criticism concerning their efforts to protect the safety of the public and preserve the environment. In many instances, oil companies are not regarded as good corporate neighbors." *Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. at 1392. Exxon has an interest in preventing these kinds of accidents from occurring in the future, and one method of prevention is to ensure that George, or any other employee, does not arrive at work impaired.

■ In any case, the identification of a well-defined and dominant public policy against having drug-impaired employees on the job does not hinge on the formal designation of the job. As discussed, the well-defined and dominant public policy revealed in *Exxon I, Exxon II* and *Exxon III* was found in regulations and laws mandating that employers furnish a drug-free workplace, as well as in common sense. The safety-sensitive designation of the employees' positions was a factor considered in the cases vacating arbitration awards, but the public policy identified was not limited to keeping impaired people from formally designated safety-sensitive positions. It is appropriate to apply the case law, regulations, statutes and executive orders to a case where the employee's position is not designated as safety-sensitive.

■ Enforcing the Arbitration Award and requiring George's reinstatement would condone his illegal activity and send a signal that drug use, and attempts to evade detection of drug use by adulterating drug tests, will be tolerated. It flies against the notions of common sense to reinstate an employee who (1) is an admitted drug and alcohol abuser, (2) relapsed after rehabilitation,[5] (3) admitted he adulterated the 7 July 1994 Specimen, (4) gave the 3 January 1995 Specimen that appeared to be adulterated, and (5) gave "implausible and unbelievable" excuses for why the 31 May 1995 Specimen tested positive for cocaine. All of these facts were disregarded, merely because the chain of custody of the 31 May 1995 Specimen was not established beyond a reasonable doubt. Well-defined and dominant public policy would be violated by enforcing the Arbitration Award. Accordingly, the Arbitration Award is vacated.

*Conclusion*

For the reasons stated, the Motion to Vacate is granted; the Motion to Confirm is denied.

---

5. The existence of George's addiction and efforts at rehabilitation are provided for background information concerning the adulteration of the 7 July 1994 and 3 January 1995 Specimens, and the positive drug test on the 31 May 1995 Specimen. They are not presented to suggest that George's termination would be justified merely because he admitted his addiction and entered rehabilitation.